Rivera Martínez, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
Farmacia Marisel presentó ante nos el 14 de noviembre de 2003, solicitud de revisión de decisión administrativa. Mediante la misma solicita la revisión judicial y la revocación de la Resolución emitida por el Departamento de Salud el 10 de octubre de 2003 y notificada a las partes el 15 de octubre de 2003.
En dicha fecha, el Departamento de Salud resolvió declarar ha lugar una solicitud de Certificado de Necesidad y Conveniencia presentada por la parte recurrida del caso de epígrafe, Walgreens of Puerto Rico, Inc., para establecer una farmacia en Humacao.
*705 Luego de varios trámites procesales ante este foro, entre los cuales se encontraron mociones de traslado* mociones de desestimación por falta de jurisdicción y sus correspondientes oposiciones, Walgreens of Puerto Rico Iric. presentó oposición a expedición de auto de revisión.
Contando con la comparecencia de ambas partes y luego de un minucioso análisis del expediente en revisión, resolvemos confirmar la resolución recurrida.
I
La cadena de Farmacias Walgreens of Puerto Rico, Inc. (en adelante Walgreens), presentó el 15 de enero de 2003 una solicitud de Certificado de Necesidad y Conveniencia, para establecer una farmacia en le Centro Comercial Plaza Malí, ubicado en la intersección de las carreteras PR-3 y PR-53, Km. 77 en Humacao.
En cumplimiento con las disposiciones de la Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, conocida como la Ley de Certificados de Necesidad y Conveniencia (en adelante Ley Núm. 2), el 8 de febrero de 2003, Walgreens publicó en el periódico El Vocero, Aviso sobre solicitudes de Certificados de Necesidad y Conveniencia. Posteriormente, el 13 de febrero de 2003, mediante comunicación escrita, se notificó al Ledo. William G. Estrella, representante legal de Farmacia Wal-Mart, la intención de la proponente Walgreens de establecer una farmacia en la dirección antes mencionada.
El 20 de febrero de 2003, dentro del término prescrito por la Ley Núm. 2, supra, la Farmacia Wal-Mart notificó su deseo de que se le mantuviera informada del proceso de la propuesta de epígrafe.
El 12 de mayo de 2003, antes de que se señalara la vista en el caso de autos, compareció la Leda. Marisel Menchaca dueña de las Farmacias Marisel #1 y #2 de Humacao, solicitando participar como interventora en el procedimiento de vistas administrativas.
El 10 de julio de 2003, Walgreens presentó escrito urgente en el cual solicitó que se excluyera a Farmacias Marisel “de toda participación en el proceso de la solicitud de CNC de epígrafe.” En dicha moción, Walgreens objetó que se permitiese la participación de Farmacias Marisel, basada en que alegadamente (1) ésta no manifestó su interés en participar e intervenir en los procedimientos administrativos oportunamente, sino más de tres (3) meses luego de haberse publicado por la Secretaría Auxiliar para la Reglamentación y Acreditación de Facilidades de Salud (en lo sucesivo SARAFS), el Aviso Público sobre la solicitud de CNC; (2) que Walgreens alegadamente nunca fue notificada por Farmacias Marisel de su interés en participar en los procedimientos adjudicativos sobre su propuesta, y (3) que Farmacias Marisel no tiene legitimación activa (standing) ni es “persona afectada” a tenor con 16 dispuesto en el Reglamento 56 del Departamento, Artículo n, inciso 25, para intervenir y/o participar en los procedimientos adjudicativos de la farmacia propuesta. Walgreens acompañó su moción, con una certificación del radio de la milla de la farmacia propuesta preparada por el Agrimensor Pedro J. Dávila Colón y una Declaración Jurada prestada por el perito economista doctor Jorge F. Freyre, quien preparó el Estudio sobre la Necesidad, Conveniencia y Viabilidad Económica de la farmacia propuesta. Igualmente en dicha moción, Walgreens argumentó que permitir la participación de Farmacias Marisel en la vista pautada le privaría de su derecho a un debido procedimiento de ley y le causaría peijuicio, ya que al no haber sido oportunamente notificada del interés de Farmacias Marisel en participar en el proceso administrativo, no había tenido la oportunidad de llevar a cabo el descubrimiento de prueba, si alguno, que éstas se propusiera presentar.
La vista en su fondo sobre la propuesta de epígrafe, se llevó a cabo el día 14 de julio de 2003, en la División de Vistas Administrativas del Departamento de Salud. Dicha vista, dio inicio atendiendo la solicitud de Walgreens a los efectos de excluir la intervención de las Farmacias Marisel. Luego de escuchar los planteamientos de ambas partes, la Oficial Examinadora resolvió permitir la participación de Farmacias Marisel, limitada al contrainterrogatorio de los testigos presentados por Walgreens, por entender que de esta *706 manera se salvaguardaba debidamente el derecho de Walgreens a un debido proceso de ley y cualquier interés que pudiera tener Farmacias Marisel en participar en la vista.
Finalmente, antes de presentar su prueba documental y testifical, Walgreens sometió e hizo formar parte del expediente, una carta fechada 7 de julio de 2003, suscrita por el Ledo. Valiente, representante de Wal-Mart, mediante la cual notificó que su participación en el proceso no era en calidad de opositor, y sí a los efectos de mantenerse informado en el proceso.
Walgreens, por su parte, presentó como testigo en la vista al Dr. Freyre, quien testificó bajo juramento y fue contrainterrogado por el Ledo. Noriega en representación de Farmacias Marisel.
De otra parte, Farmacias Marisel solicitó la desestimación de la propuesta en controversia, argumentando la violación por la proponente a las disposiciones de la Ley Núm. 2.
Así las cosas, el 10 de octubre de 2003, el Departamento de Salud emitió una resolución en la que adoptó íntegramente el informe rendido por la Oficial Examinadora, así como las recomendaciones hechas por ésta, por lo que concedió el certificado de necesidad y conveniencia a Walgreens. La referida resolución fue notificada el 14 de octubre de 2003.
Inconforme con dicha determinación, el 14 de noviembre de 2003, Farmacias Marisel presentó ante este foro solicitud de revisión. En la misma, señala que el Departamento de Salud incidió en la comisión de tres errores, a saber: (1) que el Departamento de Salud abusó y violó su deber ministerial de implementar la Ley de Certificados de Necesidad y Conveniencia al otorgarle un certificado de necesidad y conveniencia a Walgreens of Puerto Rico, Inc. para establecer una farmacia en la intérsección de las carreteras PR-3 y PR-53 Km.77 en Humacao a pesar que la construcción de dicha facilidad de salud ocurrió en violación a la Ley de Certificados de Necesidad y Conveniencia, 24 L.P.R.A. sec. 334a, la cual requiere un Certificado de Necesidad previo a la iniciación de la construcción de cualquier facilidad de salud, (2) que erró al dejar de resolver expresamente y mediante un escrito bien fundamentado, bien fuera conjuntamente con la resolución o un escrito previo, la moción de desestimación de la parte interventora habiéndola considerado durante la vista como un asunto importante a resolver y habiéndole ordenado a las partes someter por escrito sus respectivas posiciones, y (3) que erró el Departamento de Salud al otorgarle un Certificado de Necesidad y Conveniencia a Walgreens of Puerto Rico, Inc., para establecer una farmacia en la intersección de las carreteras PR-3 y PR-53, Km 77 en Humacao a pesar que la farmacia propuesta no cumple con el requisito de población por farmacia establecido en el Reglamento Núm. 56.
Considerados los planteamientos de las partes, los d.ocumentos sometidos y el derecho aplicable, procede confirmar la resolución recurrida. Veamos.
n
En el proceso de revisión de una decisión emitida por una agencia administrativa, los tribunales de apelación han de concederle gran peso y deferencia a sus dictámenes en vista de la vasta experiencia y conocimiento especializado. Misión Industrial v. Junta de Planificación, 146 D.P.R. 64 (1998).
Cuando se trata de las determinaciones de hechos que realiza una agencia, debemos tener presente que los procedimientos y decisiones de un organismo administrativo tienen a su favor una presunción de corrección y regularidad, la cual debe ser respetada mientras la parte que la impugne no produzca suficiente evidencia para derrotarla. Henríquez v. Consejo de Educación Superior, 120 D.P.R. 194, 210 (1987).
En lo que respecta a las conclusiones de derecho, éstas, si no involucran “interpretaciones efectuadas dentro de la zona de especialización de la agencia, son revisables en toda su extensión”, Rivera Rentas v. A & *707 C Development Corp., 144 D.P.R. 450 (1997), pues son los tribunales “la autoridad final en la interpretación de estatutos y, en cuestiones de derecho, poseen la facultad para revisar sin sujeción a un criterio o a una norma. ” Miranda v. C.E.E., 141 D.P.R. 775, 787 (1996). Así también cuando se trata de cuestiones mixtas de hecho y de derecho, pues éstas son consideradas como asuntos de derecho. Id.
No obstante lo anterior, los tribunales deben mirar con deferencia las interpretaciones que hacen los organismos administrativos del alcance de sus facultades si son razonables y consistentes con su propósito legislativo. Misión Industrial, supra, a la pág. 1160.
Con estos principios legales en mente, pasemos examinar la normativa jurídica aplicable al caso de autos.
El 5 de febrero de 2002, el Tribunal Supremo de Puerto Rico resolvió el caso de Asociación de Farmacias de la Comunidad v. Departamento de Salud, 2002 J.T.S. 18, Opinión de 5 de febrero de 2002 (en adelante, Asociación de Farmacias I). En dicho caso, el Tribunal Supremo determinó que el Reglamento Núm. 89 del Departamento de Salud era nulo, debido a varias faltas cometidas por la agencia en el proceso de su promulgación que contravenían disposiciones de la Ley Núm. 2 y de la Ley de Procedimiento Administrativo Uniforme. Id. a las páginas 677-79.
La anulación de dicho cuerpo reglamentario obedeció, también, a defectos de tipo sustantivo. Concluyó el Tribunal Supremo que el Reglamento Núm. 89 carecía de criterios y guías específicas que suficientemente delimitaran la discreción del Secretario de Salud al aprobar o denegar certificados de necesidad y conveniencia. Id., a la página 686. Destacó la opinión que estos criterios son, además, necesarios para que los solicitantes puedan preparar mejor “su solicitud, incluyendo toda la evidencia y los argumentos pertinentes. ” Id., a las páginas 685-86. En definitiva, el Tribunal’ Supremo determinó que el Reglamento Núm. 89 era “sustantivamente insuficiente para satisfacer el mandato de la Ley Núm. 2, y las exigencias del debido proceso de ley y de la doctrina de no-delegación por dejar puertas abiertas a la arbitrariedad y los caprichos, y por no proveer guías adecuadas a los solicitantes de Certificados de Necesidad.” Id., a las páginas 686, 689.
El mandato del Tribunal Supremo en Asociación de Farmacias I declaró que, al ser anulado el Reglamento Núm. 89, entró en vigor el anteriormente derogado Reglamento Núm. 56. En ese sentido, determinó que todas aquellas solicitudes de certificados de necesidad y conveniencia que fueran sometidas ante el Departamento de Salud debían ser examinada a la luz del mismo, así como a aquellas otras que aún se encontraran pendientes ante dicho organismo. Id., a la página 689.
En cuanto a las solicitudes que hubieren sido aprobadas o denegadas bajo el Reglamento Núm. 89, al momento en que el caso de Asociación de Farmacias I adviniera final y firme, el Tribunal determinó que serían revisadas de forma consistente con la opinión emitida. En atención a ello, la opinión explicó que la revisión judicial tendría que asegurar que la adjudicación realizada por el Departamento de Salud fuera detallada, razonada y bien fundamentada. Además de “consistente[] entre sí, con las adjudicaciones anteriores que ha hecho el Departamento, y con los criterios generales que establece la Ley 2.” Id.
Posteriormente, el Tribunal Supremo, a petición del Departamento de Salud, aceptó reconsiderar el dictamen emitido en Asociación de Farmacias I. Así, el 23 de mayo de 2002, emitió una opinión per curiam, mediante la cual dispuso que la invalidación del “Reglamento Núm. 89 debe tener un efecto prospectivo con respecto a las solicitudes pendientes en el Departamento de Salud para las cuales se haya celebrado o señalado vista adjudicativa; permitiendo así que las mismas se puedan continuar tramitando bajo el Reglamento Núm. 89.” Asociación de Farmacias de la Comunidad v. Departamento de Salud, 2002 J.T.S. 75, Opinión de 23 de mayo de 2002 (en reconsideración) (en adelante, Asociación de Farmacias II).
En cuanto a las solicitudes denegadas o aprobadas que estuvieren pendientes de revisión judicial, la opinión *708 en reconsideración reiteró que éstas serían revisadas de forma consistente con lo establecido en Asociación de Farmacias I. Id.
Expresó el Tribunal Supremo que:
“[e]l Tribunal de Circuito de Apelaciones ha de asegurar que las decisiones adjudicativas del Departamento de Salud, que han sido impugnadas y tiene ante su consideración, sean detalladas, razonadas y bien fundamentadas. Además, el referido foro examinará si dichas decisiones son consistentes entre sí y con los criterios generales que establece la Ley Núm. 2, supra. De este modo, el tribunal apelativo podrá constatar que estas decisiones no hayan sido arbitrarias o caprichosas y retiene autoridad para devolver al Departamento de Salud aquellos casos que por su falta de fundamentos requieran de una decisión administrativa detallada y razonada a la luz de lo resuelto en Asociación de Farmacias. ” Id. (Énfasis suplido.)
Por haberse sometido el presente caso con posterioridad a que la decisión del Tribunal Supremo en el caso de Asociación de Farmacias I, adviniera final y firme, el Departamento de Salud, así como este foro, evaluará el mismo a la luz del Reglamento del Departamento de Salud Núm. 56.
Según ha interpretado el Tribunal Supremo de Puerto Rico la Ley Núm. 2, supra:
“[s]e adoptó para asegurar la planificación ordenada de las facilidades y servicios de salud. Dicha ley establece la facultad del Secretario de Salud para otorgar certificados de necesidad y conveniencia para el establecimiento de nuevas facilidades de salud, cuando, ello sea necesario y conveniente para la población que dichas facilidades van a servir, siempre que no se afecten indebidamente los servicios existentes. Se contribuye así al desarrollo ordenado y adecuado de los servicios de salud en Puerto Rico. ” Artículo 1 (e), 24 L.P.R.A. see. 334. Laboratorio Clínico Instituto de Medicina Avanzada v. Laboratorio Clínico Borinquen, Inc. 149 D.P.R. 121 (1999).
Asimismo, la Ley Núm. 2, supra, dispone que un Certificado de Necesidad y Conveniencia es un: “[djocumento emitido por el Secretario de Salud autorizando a una persona a llevar a cabo cualquiera de las actividades cubiertas por esta ley, certificando que la misma es necesaria para la población que va a servir y que no afectará indebidamente los servicios existentes, contribuyendo así al desarrollo ordenado y adecuado de los servicios de salud en Puerto Rico. ” 24 L.P.R.A. sec. 334(e)
La intención de la Asamblea Legislativa al aprobar la Ley Núm. 2, supra, es establecer en Puerto Rico un sistema planificado de servicios y facilidades de salud de manera que toda la población tuviera acceso fácil a estos servicios y, además, a un costo razonable. La legislatura estableció como política pública la planificación ordenada de servicios y facilidades de salud. Estableció en la Ley unos criterios generales a considerar por el Secretario de Salud antes de expedir o denegar un Certificado dé Necesidad y Conveniencia y le ordenó a la Secretaría de Salud especificar mediante un reglamento dichos criterios generales, disponiéndose que tales criterios deberán ser consistentes con las estrategias de desarrollo adoptadas por la Junta de Planificación.
Entre los criterios que la Ley Núm. 2, supra, le ordena al Secretario de Salud a considerar antes de expedir o denegar un certificado, se encuentran los siguientes:

“(1) La relación, entre la transacción para la cual se solicita el certificado y el plan de desarrollo de servicios a largo plazo, si alguno, del solicitante.

(2) La necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada de los servicios que se proveerán mediante la misma.

*709
(3) La existencia de alternativas a la transacción para la cual se solicita el certificado o la posibilidad de proveer los servicios contemplados de manera más eficiente o menos costosa que la propuesta por el solicitante.

(4) La relación entre el sistema de salud operante en el área y la transacción propuesta.

(5) En el caso específico de solicitantes de certificados de necesidad y conveniencia para el ofrecimiento de servicios de salud, el Secretario deberá considerar también los siguientes factores:

(a) La disponibilidad de recursos humanos y económicos para el rendimiento eficiente de esos servicios.

(b) El impacto que la forma de proveer los servicios tendrá sobre las necesidades de entrenamiento clínico que puedan tener los profesionales de salud del área en donde los servicios habrán de prestarse.

(c) El por ciento de la población del áréa a ser servida que tendrá acceso a los servicios propuestos. El Secretario deberá exigir que la solicitud indique el tiempo que el solicitante necesitará para hacer disponible el servicio o equipo objeto de la petición o realizar el gasto objeto de la transacción. ” (Noviembre 7, 1975, Núm. 2, p. 1010, adicionado como art. 3 en Septiembre 19,1983, Núm. 16, p. 402, see. 5.)
La naturaleza jurídica del certificado de necesidad y conveniencia ha sido caracterizada, en el sentido de que “se trata de un mecanismo de planificación, mediante el cual, el Secretario de Salud formula e implanta a la vez la política pública sobre los servicios de salud.” Id., a la página 40; Ruiz Hernández v. Mahíques, 120 D.P.R. 80, 89 (1987). En estos casos, “[e]l Secretario, al otorgar o denegar un certificado de necesidad y conveniencia, no sólo concede o deniega un permiso para operar una facilidad de salud, sino que planifica el desarrollo de éstas en las distintas áreas regionales de salud'. Ruiz Hernández, a la página 88; Laboratorio Clínico Borinquen, a la página 40.
También se ha destacado “que la decisión de otorgar o denegar un certificado de necesidad y conveniencia surge de un proceso evaluativo institucional, que culmina con la decisión personal del Secretario. ” Hosp. San Pablo v. Hosp. Hnos. Meléndez, 123 D.P.R. 720, 732-733 (1989); Laboratorio Clínico Borinquen, a la página 41. Es un “proceso que requiere la evaluación de muchas circunstancias y factores complejos, y la ponderación de varios criterios diversos. ” Laboratorio Clínico Borinquen, a la página 41; Ruiz Hernández, supra, a la página 87.
El Tribunal Supremo ha reconocido, además, la discreción que tiene el secretario al determinar si procede o no aprobar un certificado de este tipo. No obstante, ha destacado que “[t]al decisión no puede tomarse sin antes sopesar numerosos elementos y pasar juicio sobre distintas consideraciones, para entonces determinar qué es lo que más conviene al interés general y al bien común.” Laboratorio Clínico Borinquen, supra, a la página 41.
De otra parte, el Reglamento Núm. 56 al igual que la Ley de Certificado de Necesidad y Conveniencia, supra, define “farmacia” como un “[ejstablecimiento registrado y autorizado por el Secretario de Salud en el cual se preparen, preserven, vendan y envasen productos quirúrgicos, drogas, productos farmacéuticos, especialidades farmacéuticas o de propiedad recetas, medicinas y venenos al por menor, pudiendo además, traficar con otros artículo de lícito comercio que según la costumbre se vendan en las farmacias de Puerto Rico”. Igualmente, y en lo pertinente a la controversia del caso de autos, dichos preceptos legales definen el término “construcción” como “la iniciación, remodelación o ampliación de la planta física con el propósito de terminar la edificación de una facilidad de salud'. 
Los criterios específicos aplicables a las farmacias según el Reglamento Núm. 56, son los siguientes:

*710
“1. Se establece una norma de una farmacia por cada 4,000 habitantes no indigentes para todos los : municipios, excepto San Juan, para el cual, la norma será de 3,000 habitantes no indigentes.

Categoría al cual pertenece el municipio.

Categoría I- 9,000 habitantes por farmacia

Categoría 11- 8,000 habitantes por farmacia

Categoría III - 6,500 habitantes por farmacia

San Juan - 4,000 habitantes por farmacia

2. La ubicación se evaluará a base de la necesidad del área de servicios, la cual se compondrá del área localizada dentro del radio de una (1) milla de la farmacia propuesta. Se considerara saturada un área de servicio si se sobrepasa del criterio de población aplicable. Disponiéndose, que no se denegará el certificado por la saturación de otras áreas de servicio del mismo municipio. Entre los factores que se considerarán está la . densidad poblacional del área, la población flotante, si alguna, y las vías de acceso para llegar a la facilidad propuesta.

3. No se podrá autorizar el establecimiento de nuevas farmacias en un área hasta tanto las farmacias existentes a una (1) milla redonda sobrepasen un promedio de dos mil (2,000) recetas por farmacia por mes, excluyendo las farmacias en instituciones gubernamentales. Se podrá tomar en cuenta el horario de servicios y los planes médicos a que se acogen las farmacias establecidas. ”

Por último, cabe señalar que la Ley Núm. 2, supra, en su Art. 2 dispone que “ninguna persona podrá adquirir o construir una facilidad de salud u ofrecer desarrollar un nuevo servicio de salud, o hacer inversiones de capital por, o a favor de, una facilidad de salud o adquirir equipo médico altamente especializado sin antes haber obtenido un certificado de necesidad y conveniencia. ”
III
En cuanto al primer y tercer señalamiento de error, por estar ambos relacionados, procedemos a su discusión en conjunto.
La parte recurrente plantea, en síntesis, como primer señalamiento de error que el Departamento de Salud erró al otorgarle el certificado de necesidad y conveniencia a Walgreens para establecer una farmacia en Humacao, ya que la Ley Núm. 2, supra, requiere que la proponente de una facilidad de salud obtenga dicho certificado previo a la iniciación de la construcción de cualquier facilidad de salud. De otra parte, como tercer señalamiento de error, la parte recurrente sostiene que el Departamento erró al otorgarle el certificado de necesidad y conveniencia a Walgreens, puesto que dicha propuesta no cumple con el requisito de población por farmacia establecido en el Reglamento 56.
Así, bien, Farmacias Marisel argumenta que la ley en controversia es clara al requerirle un certificado de necesidad a todo proponente de una facilidad de salud, antes de comenzar a construirla. Expone a esos fines que, en el caso de autos, es evidente que Walgreens construyó la facilidad en controversia, con el propósito de edificar una facilidad de salud y que al así actuar atentó contra la política pública de planificación ordenada de facilidades de salud.
Por otra parte, Walgreens, en su escrito, expone que no obstante la participación de Farmacias Marisel estar limitada al contrainterrogatorio de los testigos presentados por Walgreens, ésta levantó un alegado *711 incumplimiento estatutario de Walgreens con la Ley Núm. 2, supra, sin seguir las garantías del debido proceso de ley contenidas en el Reglamento 85. Ello, según alega, ya que de acuerdo con dicho reglamento, Farmacias Marisel debió haber presentado una querella en un procedimiento independiente en donde expusiera los hechos básicos que motivaron dicha reclamación y la alegada violación de ley, así como el remedio que solicita.
Sin embargo, según alega Walgreens, Farmacias Marisel optó por dilucidar la presente controversia vía intervención en el presente procedimiento administrativo. Ante ello, alega Walgreens que Farmacias Marisel no tiene legitimación activa en el caso de autos.
De otra parte, como indicáramos, Farmacias Marisel argumenta que Walgreens inició la construcción de la facilidad en controversia sin contar previamente con un certificado de necesidad y conveniencia.
En el caso de autos, la resolución recurrida del Departamento de Salud dispuso todos los criterios generales establecidos en el Reglamento 56, los cuales la agencia debe tomar en consideración al evaluar una solicitud de certificado de necesidad y conveniencia y relacionó los mismos con la prueba presentada ante sí. Al así hacerlo, concluyó que Walgreens demostró a satisfacción que era necesario y conveniente la ubicación de la farmacia propuesta. Concurrimos con dicha determinación. Veamos.
La farmacia objeto de la presente controversia file construida en virtud de un permiso de construcción válido y legítimo emitido por la Administración de Reglamentos y Permisos (en adelante ARPE). De dicho permiso de construcción otorgado por ARPE el 23 de septiembre de 2002, se desprende claramente que era a los efectos de establecer una tienda para la venta de artículos al detal en Plaza Malí Humacao. Posteriormente, el 24 de junio de 2003, ARPE expidió un permiso de uso a Walgreens a los efectos de establecer una “[tjienda de venta al detal, comestibles, joyería, tabaco, revelado de fotos y accesorios para autos, en Plaza Malí Humacao 
Ante lo expuesto, Walgreens está en todo su derecho de llevar a cabo bajo su nombre comercial los negocios para los que está autorizada, entiéndase farmacias o ventas al detal de productos de consumo general. Ahora bien, cabe señalar que el hecho de que Walgreens solicite un certificado de necesidad y conveniencia una vez iniciada la construcción de dicha facilidad para establecer una farmacia, no burla en modo alguno la jurisdicción de ARPE, pues dicha agencia no puede autorizar el establecimientos de farmacias. Tampoco burla la jurisdicción del Departamento de Salud, pues si dicha agencia le deniega la expedición de un certificado de necesidad y conveniencia, Walgreens no podrá establecer una farmacia, independientemente de que esté autorizada a establecer una tienda al detal.
Contrario a la alegación de la parte recurrente, Walgreeens no ha actuado de forma ilegal alguna, puesto que al no tener un certificado de necesidad y conveniencia previo a solicitar el permiso de construcción y de uso ante ARPE, ésta sólo podía notificarle a dicha agencia, como se hizo en el caso de autos, que llevaría a cabo el tipo de actividad comercial para la cual estaba autorizada a desarrollar en ese momento.
Del expediente en revisión, se desprende que actualmente Walgreens opera cuatro (4) establecimientos que no cuentan con recetario debido a que no les fue extendido un certificado de necesidad y conveniencia. Ello, deja establecido que Walgreens está en todo su derecho de establecer un negocio de ventas al detal de productos de consumo general, independientemente de que posteriormente el Departamento de Salud, le otorgue un certificado de necesidad y conveniencia para establecer una farmacia.
Por otro lado, en cuanto al planteamiento de la parte recurrente relativo a que el Departamento de Salud abusó de su discreción al otorgarle un certificado de necesidad y conveniencia a la farmacia propuesta, aun cuando la construcción de dicha facilidad había sido comenzada, es totalmente desacertada. Si bien el Artículo 2 de la Ley Núm. 2, sección 334a, dispone que “[njinguna persona podrá adquirir o construir una facilidad de *712 salud u ofrecer o desarrollar un nuevo servicio de salud, ... sin antes haber obtenido un certificado de necesidad y conveniencia otorgado por el Secretario... ”, no es menos cierto que Walgreens está autorizada en el caso de autos a establecer una facilidad dedicada a la venta al detal de productos en general.
Analizando lo previamente expuesto, en conjunto con la definición de farmacia que expone la Ley y el Reglamento en el caso de autos, sería absurdo concluir que se prohíbe la construcción de una facilidad que se propone llevar a cabo otras actividades comerciales, independientemente de que posteriormente solicite un certificado de necesidad y conveniencia para construir un recetario en dicha facilidad.
El Proyecto de la Cámara de Representantes 3392, de 22 de enero de 2003, perseguía, en síntesis, enmendar el Art. 2 de la Ley Núm. a los efectos de requerir un certificado de necesidad y conveniencia a un constructor, ingeniero, desarrollador o cualquier persona natural o jurídica que interese construir, remodelar o rehabilitar una estructura o edificio con el fin de venderlo o arrendarlo a una empresa que eventualmente lo dedicará en todo o en parte a ofrecer servicio de salud. Ello, aun cuando el propósito inicial o aparente expresado en la solicitud de permiso de construcción del establecimiento, edificio o estructura, sea uno distinto al de una facilidad de servicios de salud, si de la totalidad de las circunstancias existiera base razonable para concluir que el mismo será dedicado eventualmente á una farmacia de salud regulada por dicha ley.
Dicho proyecto, al día de hoy, no se ha aprobado, por lo que la legislación actual no requiere un certificado de necesidad y conveniencia a una entidad que vaya a vender productos al detal en general.
De otra parte, Farmacias Marisel alega que la propuesta de Walgreens no cumple con el requisito de población por farmacia establecido en el Reglamento 56. A esos efectos, señala que el criterio de población por farmacia no es meramente un criterio reglamentario. Ello, ya que la Ley Núm. 2, 24 L.P.R.A. sec. 334b, le ordena al Secretario a considerar la necesidad actual proyectada que tiene la población a ser afectada por la transacción contemplada. Aduce que en el caso de autos, Walgreens justifica su propuesta utilizando el concepto de población flotante, el cual a su juicio es tan sólo un factor reglamentario a considerar para determinar si una determinada ubicación es viable.
La resolución recurrida, dispuso a esos fines que:

“8. Con relación a la estructura donde ubicaría la facilidad propuesta indicó que la misma estaría separada del centro comercial, lo que a su vez le permite establecer el servicio de auto-farmacia. El perito Freyre aclaró que Wal-Mart es la única farmacia existente en el área de servicio y no posee el servicio de auto-farmacia, por ser parte de la estructura del centro comercial.

9. Sobre la población residente del área de servicio ', el perito indicó que para el 2000, la misma consistía de 5,270 habitantes. Además indicó que su ingreso per cápita para el 1999 alcanzó los $10,304, excedió un 25.9% el ingreso per cápita de Puerto Rico. En el Estudio de Viabilidad se consideran las características de los residentes del área de servicio al indicar que un 36% dé éstos, para el 1999, se encontraban por debajo del nivel de pobreza en comparación con el 48.2% de Puerto Rico. Además, se indica que unos 1,460 residentes de 5 años o más adolecían de algún tipo de incapacidad. (Citas internas omitidas).

10. De la población flotante, el perito Freyre indicó que para calcular la misma utilizó los datos de tráfico de la PR-3 en su punto más cercano a la farmacia propuesta, KM 78. Cabe señalar que la farmacia propuesta ubicaría en el KM. 77. El perito indicó que conforme las cifras del Departamento de Transportación y Obras Públicas, específicamente la Autoridad de Carreteras, para el 2001, el tráfico vehicular fue de 26,700. Además, indicó que consideró unos 6,500 vehículos de la PR-53 que a su vez se proyectó en aproximadamente unos 7,700 para el 2003. Sobre este particular, el perito indicó que si se unen las proyecciones de la PR-53 con la PR-3, se obtendría un flujo vehículo de aproximadamente 36,500 vehículos. 

*713
11. El perito Freyre indicó que para determinar la población flotante utilizó la cifra de 32,000 vehículos, la cual consideró más conservadora. Explicó que esta cifra (32,000), la dividió entre dos (2) para evitar la [sic] doble conteo, obteniendo como resultado (16,000) y luego la multiplico por 1.7 ó 2 personas por vehículos para un total de 27,200 o 32,00o personas. A estas cifras le restó la población residencial para obtener una población flotante que fluctuaría entre 22,000 y 27,000 personas. El perito aclaró que utilizó la medida de estos últimos dos números, para un total de 24, 500 personas como población flotante. Sin embargo, indicó que obviando el flujo vehicular de la PR-53 y limitándose al punto más cerca de la facilidad tendría un nivel de 26, 700 vehículos para el 2001 que se proyecta en unos 28,836 para el 2003. Al dividir esa cifra entre dos obtendría un promedio de 14, 418 vehículos diarios que al multiplicarlos por 1.7 ó 2 promedio de personas por vehículos resulta en 24,500 ó 28,800 personas que al restarle la población residencial, es decir 5,270 personas, resulta en 21, 400 personas como población flotante. El perito indicó que esta cifra es conservadora, ya que al considerar la viabilidad económica de este centro comercial, se estimaran unas ventas de 84 millones de dólares anuales, lo que requiere de la población flotante para alcanzarla. (...)”.

De otra parte, en la determinación de hecho 23 de dicha resolución, la Oficial Examinadora expuso:

“23. Sobre la población residente, las partes estipularon que no se cumple con la norma poblacional establecida en el Reglamento 56. Sin embargo, el perito Freyre explicó que la única farmacia que existe en el área de servicios ha demostrado que es una que sirve a una comunidad de población residente y flotante y que despacha una 130,000 recetas anuales y que se ha demostrado la necesidad y conveniencia de una farmacia adicional. Además, el perito indicó que la facilidad propuesta es otra alternativa de servicio para los residentes del área. El perito explicó que, por la distancia, la población a ser servida por la nueva farmacia es distinta a la servida por la otra sucursal de Walgreens existente en Humacao. ”

A esos efectos, la Oficial Examinadora concluyó que aun cuando la acción propuesta no cumple con el requisito poblacional, el proponente la colocó en posición de evaluar la demanda de servicios farmacéuticos existe en el área de servicio de la milla radial y que la facilidad propuesta puede contribuir a satisfacer la misma. Así, también, concluyó que la proponente demostró a satisfacción que la facilidad propuesta ubicaría en un área con dos vías de acceso importantes al área que atrae sustancialmente población flotante. Al igual que demostró a través de un estimado conservador que existe una población que necesita de los servicios propuestos.
Así bien, el Reglamento 56 dispone, como citáramos previamente, que:
“La ubicación se evaluará a base de la necesidad del área de servicios, la cual se compondrá del área localizada dentro del radio de una (1) milla de la farmacia propuesta. Se considerara saturada un área de servicio si se sobrepasa del criterio de población aplicable. Disponiéndose, que no se denegará el certificado por la saturación de otras áreas de servicio del mismo municipio. Entre los factores que se considerarán está la densidad poblacional del área, la población flotante, si alguna, y las vías de acceso para llegar a la facilidad propuesta. ” (Enfasis nuestro).
En el caso de autos, la agencia aplicó los criterios generales expuestos en el Artículo 3 de la Ley Núm. 2, supra. En particular, consideró la necesidad actual y proyectada que tienen los residentes de los servicios ofrecidos. A base de su análisis, determinó que existe una población que necesita los servicios propuestos. Concluyó también que el proponente demostró que en el área de servicio de la milla radial existe una demanda de los servicios farmacéuticos, que la facilidad propuesta puede contribuir a satisfacer la misma. No encontramos que dicha determinación de población flotante sea arbitraria o irrazonable.
Obligar a que la agencia establezca unas normas rígidas e inflexibles equivale, a nuestro juicio, a usurpar el ejercicio de la discreción delegada a la agencia. Nuestra función revisora se limita a evaluar la razonabilidad de *714 los fundamentos utilizados por la agencia al emitir su dictamen y aseguramos que los mismos estén sostenidos por evidencia sustancial. Los tribunales no debemos sustituir el criterio de la agencia por el nuestro.
Sostenemos que no erró la agencia recurrida al aplicar estos principios y concluir que procedía la expedición del certificado de necesidad y conveniencia en el caso de autos.
En conclusión, sostenemos que la decisión de la agencia administrativa está sustentada por evidencia sustancial, por lo que el error señalado no fue cometido.
Por otro lado, como tercer señalamiento de error, lá parte recurrente argumenta, además, que el Departamento de Salud erró al dejar de resolver expresamente y mediante un escrito bien fundamentado, bien fuera conjuntamente con la resolución o un escrito previo, la moción de desestimación presentada por dicha parte, habiéndola considerado durante la vista como un asunto importante a resolver. No le asiste la razón.
Del Informe de la Oficial Examinadora se desprénde que ésta resolvió la referida moción de desestimación. La nota al calce número uno dispone que “[l]uego de un análisis de los argumentos de las partes, esta Oficial Examinadora determinó que la solicitud de desestimación debía ser evaluada en los méritos del caso conforme los requeridos [sic] de la Ley Núm. 2, supra, y el Reglamento 56 que giran entorno al cumplimiento de los requisitos para el establecimiento de farmacias y política pública del Departamento. ”
Conforme a lo anterior, la agencia, en efecto, dispuso la moción de desestimación presentada por la parte recurrente, por lo que dicho señalamiento de error no fue cometido.
IV
Por todos los fundamentos de hechos y de derecho anteriormente esbozados, resolvemos confirmar la resolución recurrida.
Notifíquese.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2005 DTA 9
1. Mediante resolución de 16 de marzo de 2004, este foro resolvió declarar no ha lugar dicha moción de desestimación.
2. Véase, Solicitud Urgente para que no se permita participación de Farmacia Marisel, Apéndice 1, págs. 1-6 del escrito de oposición a revisión.
3. Ver 24 L.P.R.A. secc. 334 (q) y Reglamento Núm. 56 Artículo VI, inciso (13).
4. Ley 24 L.P.R.A. secc. 334 (f) y Reglamento Núm. 56 Art. 2 inciso (6).
5. Véase Apéndice 82 del escrito de revisión.
6. Véase Apéndice 81 del escrito de revisión.
7. Los establecimientos de Walgreens que no cuentan con un certificado de necesidad y conveniencia son:

*715
“1. Walgreens de la Calle Cruz y San Francisco en el Viejo San Juan;

2. Walgreens de la Ave. La Sierra y Carr. 77 en Cupey;

3. Walgreens del Centro Comercial de Yauco, conocido como “Yauco Plaza”;

4. Walgreens de la Ave. Jesús T. Pinero y Ave. César González”.

8. Dicho proyecto fue radicado el 22 de enero de 2003, en esa misma fecha fue referido a la Comisión de la Cámara. El 25 de febrero, el 4 de marzo y el 2 de abril de 2003, se llevaron a cabo unas vistas públicas ante la Comisión de Salud de la Cámara.
9. Para llegar a esta cifra, el perito realizó una proyección anual de 4% para el 2002 y el 2003 de los 26,7000 vehículos que transitan por la PR-3 y lo sumó a la proyección de los 7,700 vehículos de la PR-53.